## CINCINNATI, N. O. & T. P. Ry. Co. *v.* MEALER.

### (*Circuit Court of Appeals, Sixth Circuit.* June 6, 1892.)

**1. MASTER AND SERVANT—PERSONAL INJURIES—PROXIMATE CAUSE—RAILWAY SWITCH-MAN.**

A yard switchman in uncoupling cars was walking or running with the train, for the purpose of lifting the pin, when he stumbled over a piece of coke on the track, and his arm was thrown between the deadwoods and injured. *Held,* that the stumbling was the proximate cause of the injury, and evidence as to the defective condition of the drawbar was immaterial.

**2. SAME—FELLOW SERVANTS.**

As it was the duty of the section men to remove coal or coke from the tracks, there can be no recovery for their negligence in failing to do so, since they and the switchman were coservants.

**3. SAME—DUTY TO INSTRUCT SWITCHMAN.**

The switchman testified that he was about 22 years old, had been employed as such for three weeks, had known the tracks in the yard for three months, and knew all that was necessary to enable him to couple and uncouple cars. It was conceded that at the time of the injury he was uncoupling cars in a necessary and proper manner. *Held,* that it was not necessary for the defendant to show that it had instructed, or offered to instruct, the plaintiff how to couple and uncouple cars.

In Error to the Circuit Court of the United States for the Southern Division of the Eastern District of Tennessee.

Action by Charles Mealer against the Cincinnati, New Orleans & Texas Pacific Railway Company for personal injuries. Verdict and judgment for plaintiff. Defendant brings error. Reversed.

*Lewis Shepherd* and *Edward Calston,* for plaintiff.

*Fred L. Mansfield* and *T. M. Burkett,* for defendant.

Before JACKSON, Circuit Judge, and SAGE and SWAN, District Judges.

SAGE, District Judge. Upon the trial of this case the following facts appeared in evidence: On the 28th of October, 1890, the defendant in error, Mealer, was a switchman in the employment of the railway company, plaintiff in error, in its yard at Oakdale, Tenn. Shortly after nightfall a through freight train from the north arrived, and was taken charge of by the night yard master. While it was yet moving, he directed Mealer to cut off the caboose and one car. Mealer went between the cars, which, it is shown by the evidence and is conceded, was necessary and proper, and, finding that the coupling pin was pushed back under the draft timbers, so that he could not pull it out, held to the pin, running along (in another part of his testimony he said "walking") and keeping pace with the motion of the train, was expecting the engine to slack ahead a little, so that the pin would be released from under the end sill, and could be lifted out. Just then the forward car "surged ahead and right back again," and, according to his own testimony, which is the only evidence giving the particulars of the accident, he struck his foot against a piece of coke or coal on the track, and, stumbling, partially fell. That threw his arm down between the deadwoods, there being nothing on the car to hold to. At the same time the rear

car ran up against the car forward, and his arm was caught and crushed between the deadwoods, which were placed, as is usual, on each side of the drawheads, so as to protect the cars and prevent the breaking of the drawbars if a drawbar spring was out of order, or not strong enough to keep the cars apart.    He testified that to the best of his knowledge what he struck his foot against was a piece of coke, which had fallen off from the cars they had been coupling, and that if there had been a spring in the drawhead it would not have been driven back under the sill and fastened.

Mealer had been in the employment of the railway company some three months, at first as yard clerk, from which service he was transferred, about three weeks before he was hurt, by the general yard master to the night yard master's department, and set to work as a switchman, without having had experience as such, excepting, as he testifies, that he had switched a few nights at Oakdale, when any man was off. Before engaging in the employment of the railway company, he had been a brakeman on another railroad, but for what length of time does not appear.    He was 22 years of age when he received the injury.    He testified also that he was not instructed by the night yard master how to couple and uncouple cars, but that he knew how to do that work, and that such instructions were not necessary.    He further testified that he had gone over the yard daily, from the time of his first entering the service of the company, and knew its condition; that they hauled about one train of 25 cars of coal or coke there per day; that he had frequently seen lumps of coal and coke fall from the cars, but did not notice any on the track where the accident occurred on that or the previous evening.

The night yard master, called as a witness by Mealer, testified that in switching coke sometime fell off when couplings were made; that that was a usual thing; that he made an examination at the place of the accident immediately after it occurred, and saw pieces of coke on top of the cinders on the track, and that they were "a couple of inches through, or it might have been larger;" also, that when a person is running between the cars he is likely to be thrown off his balance by striking his foot against a small lump of coal or coke.

The uncontradicted testimony of the road master, and the only testimony on that subject, was that it was the duty of the section boss and his hands, (there were eight or nine of them,) to go through the yards daily, and remove all obstructions, including lumps of coal or coke, from the tracks, and keep them cleared up.

All testimony tending to prove that the spring of one of the drawbars was weak or defective, having been admitted subject to exception, was withdrawn from the jury on the motion of counsel for the railway company; the court holding that it was not competent, because there was no complaint of any such defect in the declaration.

When the evidence in the case was all in, counsel for the railway company moved the court to direct a verdict in its favor.    The motion was overruled.    The case was then argued and submitted to the jury under

the instructions of the court, and a verdict was returned against the railway company for $1,750.

The court instructed the jury that the employment of a railroad switchman was necessarily dangerous, but that those who enter it, knowing that it is dangerous, assume the natural and ordinary risks and perils involved, as well as all risks of injuries resulting from the negligence of fellow servants; also, that if in this case the tracks were in bad condition, or strewn with lumps of coal or coke, and Mealer was passing over the tracks every day, and saw that they were in that condition, and, continuing in the service of the railroad company, suffered injury therefrom, he had no right to complain. These instructions were entirely correct, and, inasmuch as the only evidence in the case, including the indisputable testimony of Mealer himself, was that he had full and complete knowledge of all the conditions referred to, they should have been supplemented by a direction to the jury to return a verdict against him. But instead, the court proceeded to charge the jury that if they believed that Mealer was without experience or training, that no effort was made by any officer of the company to train him, and that by reason of his inexperience and want of knowledge he was not in a condition to appreciate the dangers of his service, and he suffered injury under the direction of some one placed over him, then he ought to recover; and the court referred to the night yard master, and the chief yard master, each by name, as the representatives of the company placed over and directing and controlling him. There was no evidence in the case warranting any of these instructions. Mealer had been acting as switchman in that yard about three weeks before the accident, and he himself testified that he had known the yard and the tracks three months, and had been over them daily, and that he was so familiar with the mode of coupling and uncoupling cars that he needed no instruction on that subject. More than that, it appears from the testimony, and it is conceded by his counsel in their brief, that he went about the business of uncoupling the cars at the time when he was injured in the manner that was necessary and proper. The testimony was all one way. Instead of directing a verdict, the court allowed the jury to make a finding not warranted in law or by the testimony, and on the same day a motion for new trial was overruled, and judgment for the full amount entered up.

Cases are cited in support of the instructions given the jury with reference to the duty of employers to warn inexperienced servants. The law upon that point is well settled, and needed no verification, but it has no application to this case, as is above shown. Much is said about the drawhead being out of repair and in bad condition, but it is not even pretended that there was any defect, excepting in the spring, and that mainly by inference; and all the evidence with reference to the spring was properly withdrawn by the court from the consideration of the jury. If the motion to withdraw that testimony had been overruled, and it were conceded that it was sufficient to sustain a finding that the drawbar was in bad condition, that would not affect the case, because the only proper conclusion that can be drawn from the evidence is that the

stumbling, from coming into contact with the lump of coke on the track, was the proximate cause of the injury. Mealer testifies explicitly that that threw his arm down between the deadwoods a moment before they came together, and not only testifies to it, but repeats it. It is therefore a matter of no consequence whether the drawbars were in good or bad condition. *Railway Co.* v. *Kellogg*, 94 U. S. 469. As to the coal or coke upon the track, the only testimony in the record on that subject is that it was the duty of the section men to remove it, and to keep the tracks cleared up. They were Mealer's fellow servants, and he could not recover for injuries resulting from any failure of duty on their part.

Whether the night yard master or the general yard master was a representative of the railroad company as to Mealer is not at all material. The court properly instructed the jury that his entering upon the service of the company as a switchman must be regarded as voluntary. The general yard master was not present, and no instruction was given Mealer by the night yard master on the occasion of his receiving the injury, excepting to uncouple the cars, or, in other words, to render, under ordinary and usual conditions, the very service that he had, by his contract of employment, engaged to render, and the incidental and natural risks of which he had thereby agreed to assume, and which he did assume when he entered upon the employment.

The motion to direct a verdict was rightly made at the close of all the evidence. *Randall* v. *Railroad Co.*, 109 U. S. 481, 482, 3 Sup. Ct. Rep. 322. The exception taken to the overruling of that motion, and to the portions of the charge above considered, are sustained. The judgment below will be reversed at the costs of the defendant in error.